## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ISABEL ARANA,

                          Plaintiff,

        v.

ROBERT MOLTA, CATHERINE MOLTA, and
WENEEDAVACATION.COM, LLC,
                          Defendants.

## **COMPLAINT**

Plaintiff ISABEL ARANA ("Ms. Arana" or "Plaintiff") files this Complaint against

Defendants ROBERT MOLTA ("Mr. Molta"), CATHERINE MOLTA ("Mrs. Molta") (Mr. Molta

and Mrs. Molta collectively, "Moltas"), and WENEEDAVACATION.COM, LLC ("WNAV")

(Moltas and WNAV collectively, "Defendants"), showing in support as follows:

## **NATURE OF THE CASE**

1.      This is a civil action brought by Ms. Arana against (i) the Moltas for (a)

negligence and (b) multiple violations of Mass. Gen. Laws ch. 93A and (ii) WNAV for

negligence in connection with personal injuries Ms. Arana sustained to her left leg and knee after

falling through rotten pool deck boards at 49 Barristers Walk, Dennis, MA 02638 ("Property") in

June of 2020 while Ms. Arana was legally on the Property under the express terms of a lease

agreement.  The Moltas, who advertised the Property through WNAV, are the owners of record of

the Property and entered into a lease with Ms. Arana and her family to rent the Property for

approximately one month.  Ms. Arana and her family found the Property advertised on WNAV's

website.

## PARTIES

2.     Ms. Arana is an adult natural person who is domiciled in the State of New Jersey and resides in Bergen County, New Jersey.

3.     Mr. Molta is an adult natural person who is domiciled in the Commonwealth and resides in Southwick, Hampden County, Massachusetts.

4.     Mrs. Molta is an adult natural person who is domiciled in the Commonwealth and resides in Southwick, Hampden County, Massachusetts.

5.     WNAV is a domestic limited liability company duly organized under the laws of the Commonwealth and has a principal place of business in Orleans, Barnstable County, Massachusetts.

6.     The Property that Plaintiff and her family rented from the Moltas (and where Ms. Arana sustained the injuries she suffered as a result of the Defendants' negligence as alleged in this Complaint), is located in the town of Dennis, Barnstable County, Massachusetts

## JURISDICTION & VENUE

7.     Subject matter jurisdiction is proper in this Honorable Court pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds well over SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) and the controversy is "between citizens of different States".  To wit, Defendants are domiciled in and are citizens of the Commonwealth and Plaintiff is domiciled in and a citizen of state of New Jersey.

8.     This Honorable Court has personal jurisdiction over the Moltas because they are domiciled in and citizens of the Commonwealth and both own real estate in the Commonwealth (the Property where Ms. Arana was injured) and the Moltas transact business in the Commonwealth (marketing and renting said real property located in the Commonwealth to the

public) and both Mr. and Mrs. Molta engaged in acts and/or omissions that caused the tortious injury to Ms. Arana (as alleged herein).

9.    This Honorable Court has personal jurisdiction over WNAV because it is domiciled in the Commonwealth and advertised the Moltas' Property for rent in the Commonwealth to the public and it engaged in acts and/or omissions that caused the tortious injury to Ms. Arana (as alleged herein).

10.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2).  To wit, Ms. Arana sustained personal injuries while legally on the Property under the terms of a written lease and the Moltas' Property – advertised by WNAV – is located in Dennis, Massachusetts.  Moreover, venue is proper pursuant to 28 U.S.C. §1391(b)(1).

11.    Ms. Arana sent her Mass. Gen. Laws ch. 93A demand letter to the Moltas via certified mail, return receipt requested, on February 17, 2023.

## FACTS

12.    The Moltas are the record owners of the Property pursuant to the deed(s) recorded on Book 26293, Page 303 (April 30, 2012 Quitclaim Deed) at the Barnstable County Registry of Deeds.

13.    The Moltas offered the Property for vacation rentals to the general public through WNAV.

14.    Ms. Arana's daughter, Melissa Ibach ("Mrs. Ibach"), and Mrs. Ibach's husband found the Property for rent on WNAV's website and inquired about renting the Property for May/June of 2020.

15.    The Ibachs and Ms. Arana were looking to rent a property for a month-long vacation in Massachusetts – this was during the first summer of the COVID-19 pandemic.

16.     In WNAV's advertisement, there were pictures of the Property which included pictures of a pool surrounded by a wooden pool deck with pool deck chairs and a grill for barbecuing.

17.     The Ibachs (who have two (2) minor children) and Ms. Arana primarily wanted to rent the Property because they wanted to enjoy themselves *outside* in the pool and pool deck – isolated from the public – during that first summer of the COVID-19 pandemic when there was no vaccine available for it.

18.     Moreover, Ms. Arana had underlying health conditions, was in her sixties, and was at "high risk" for possible negative outcomes (including hospitalization and death) should she contract COVID-19.

19.     After exchanging emails with Mr. Molta, the Ibachs entered into a thirty (30) day lease agreement to rent the Property from the Moltas for the period of May 25, 2020, through June 26, 2020, in exchange for a significant payment of money for the right to rent and use the Property for the duration of the lease.

20.     The Ibachs, their children, and Ms. Arana were all designated as "Registered Occupants" under the express terms of the lease agreement.

21.     On or about May 24, 2020, the Ibachs and their children arrived at the Property and settled in.

22.     On Friday, June 5, 2020, when the Ibachs were putting the pool cover back on the pool at the end of the day, Mrs. Ibach was walking on the pool deck when she heard a pool deck board crack underneath her.

23.     Mrs. Ibach was concerned and took a picture of the cracked pool deck board and texted the picture of the cracked pool deck board to Mr. Molta along with a message telling him that the board "came up" when she stepped on it.

24.     Mr. Molta responded to Mrs. Ibach, "Thanks so much... we can have our handyman look at it.. I'm so sorry.. thanks for letting me know.."

25.     Mr. Molta did not send someone out that weekend to inspect and/or repair the pool deck, despite having been given actual notice of the cracked pool deck board and despite having actual knowledge that there was a family of five (5) renting the Property.

26.     Ms. Arana arrived a few days later and Mrs. Ibach told Ms. Arana about the cracked pool deck board and that Mr. Molta said someone was going to come over and fix it.

27.     Ms. Arana was careful around that area of the pool deck where the pool deck board had cracked.

28.     Unfortunately, Mr. Molta never sent his "handyman" or anyone else for that matter, out to fix and/or inspect the pool deck and on the evening of Thursday, June 11, 2020 – six days after Mr. Molta had been given *actual notice* of the cracked pool deck board – Ms. Arana was on the pool deck and an area of rotten pool deck boards disintegrated beneath her and her left leg went through the pool deck up to her mid-thigh.

29.     The Ibachs and their two (2) children witnessed Ms. Arana fall through the pool deck.

30.     Ms. Arana needed the help of the Ibachs to extract her from the pool deck as she was crying and screaming in pain and agony.  Ms. Arana was stunned, in shock, and in great pain after what had just happened and she was not sure what to do next.

31.     Ms. Arana's left leg and knee were clearly injured and she was in pain – she had also aggravated her left shoulder when she fell through the pool deck.

32.     With the help of the Ibachs, she limped off the pool deck and went inside the house to sit down at the dining room table.

33.     Ms. Arana took a closer look and she had red marks, scrapes, and abrasions on her left leg; it had already started to swell significantly and bruise; and her left leg and knee were injured.

34.     Ms. Arana discussed with her daughter that she was very afraid to go to an Emergency Room because of the COVID-19 pandemic and her "high risk" status – Ms. Arana did not want to die from COVID-19.

35.     Ms. Arana lived in New Jersey and was fully aware of all of the deaths "high risk" people in New Jersey and New York during the initial months of the COVID-19 pandemic.

36.     Mrs. Ibach texted Mr. Molta that Ms. Arana had fallen through the pool deck boards.

37.     Mr. Molta replied via text message that "Scott will be over tomorrow to address" the pool deck and he stated that he was "sorry about the deck."

38.     When Scott came over the next day on June 13, 2020 – eight (8) days after Mrs. Ibach provided actual notice to Mr. Molta regarding the cracked, rotten pool deck boards – to finally fix the rotten pool deck, Mrs. Ibach told Scott what happened with the pool deck board breaking on June 5th and that she had texted Mr. Molta as such.

39.     Mrs. Ibach also told Scott that Ms. Arana was injured when she fell through the pool deck boards two (2) days prior.

40.     In response, Scott told Mrs. Ibach that he (Scott) had told Mr. Molta about the rotten pool deck boards and the need to replace the boards/repair the pool deck before Ms. Arana and the Ibach family rented the Rental Property, but that Mr. Molta did not hire him to do so.

41.     That same day, Scott replaced and repaired the rotten pool deck boards where Ms. Arana had fallen through and at another location with rotten deck boards.

42.     On or about June 15, 2020, after returning to her home in New Jersey, Ms. Arana went to see her primary care physician ("PCP") for the injuries she sustained from falling through the rotten pool deck boards at the Property.

43.     Her PCP referred her to an orthopedic specialist, Dr. Francis Alberta who examined her, sent her for imaging on her left knee and leg and ultimately diagnosed her with several injuries, including a fracture of her left tibia.

44.     Dr. Alberta referred Ms. Arana to physical therapy for her injuries, but told her she could not start physical therapy until the swelling in her left knee subsided and the fracture had time to heal.

45.     Ms. Arana was finally able to start physical therapy on or about August 20, 2020, at the Rothman Institute in New Jersey.

46.     From August 20, 2020, through January 21, 2021, Ms. Arana attended approximately thirty (30) physical therapy sessions with her physical therapist, Susana Gujini ("Ms. Gujini").

47.     At that point, although Ms. Arana was still experiencing some stiffness in her left knee with a "clicking" noise when she bent her left knee and although Ms. Arana was not completely healed and back to "normal" – as she was before the injuries – Ms. Gujini discharged

Ms. Arana from in-person physical therapy with a detailed home exercise program ("HEP") to follow in order for Ms. Arana to continue to improve.

48.     Ms. Arana followed up with Dr. Alberta and after examining her and consulting with physical therapy, Dr. Alberta did not think there was much else that could be done to improve the condition of her knee – that was essentially as "good as it would get."

49.     Ms. Arana sought a "second opinion" from Dr. Jonathan M. Archer ("Dr. Archer") of North Jersey Orthopedics Specialists who examined Ms. Arana in April 2021.

50.     Ms. Arana was seeking a second opinion specifically on treatment for her left knee and leg in light of what Dr. Alberta had told her because she still had pain and swelling in her left knee/leg and her left knee still made a "clicking" noise when she would bend it.

51.     Ms. Arana still had trouble walking any significant distance without feeling pain and/or soreness in her left knee and leg.

52.     In examining Ms. Arana, Dr. Archer noted that Ms. Arana "presents with complaint of left knee pain and swelling" from an incident in Cape Cod where she stepped on a pool deck which gave way and her leg went through pool deck up to her thigh.

53.     Dr. Archer noted that she was initially treated by Dr. Alberta who ordered an MRI that showed a "large hematoma and non-displaced lateral tibial plateau fracture" in her left leg and knee.

54.     He also noted that she had gone through two (2) rounds of physical therapy, but continues to have pain and swelling.

55.     Dr. Archer noted that Ms. Arana had a follow up MRI that showed "the fracture had healed and the Hematoma improved, but her pain and swelling continues."

56.     Dr. Archer examined Ms. Arana and noted that "swelling is present over the medial side [of the left knee]" and that "tenderness was present to palpitation at site of Hematoma and [knee] joint on both sides."

57.     Dr. Archer noted that surgery was not necessary as the fracture had healed and that the only treatment option was essentially continued physical therapy.

58.     Dr. Archer informed Ms. Arana that the current condition of her knee might be as good as it would be after the injury.

59.     The swelling in Ms. Arana's left knee/leg is readily visibly and this is especially evident when compared to her right knee/leg and the difference has been documented at several points in time over the last three (3) years with photographs.

60.     Ms. Arana is going to have this permanent disfigurement of her left knee/leg for the rest of her life.

61.     Ms. Arana is embarrassed by the noticeable difference in size of her knees caused by the swelling and does not feel comfortable wearing shorts or a skirt outside of her own home due to the appearance of her left knee/leg.

62.     Ms. Arana's left knee disfigurement is also noticeable when she wears pants.

63.     Moreover, Ms. Arana continues to have pain and discomfort in her left knee and leg.

64.     The swelling, pain, and discomfort in Ms. Arana's left knee and leg limits her physically.

65.     Ms. Arana is unable to take anything but short walks with her dog (she can no longer do medium or long-distance walks like she used to before the injury on a daily basis), which she used to enjoy on a daily basis.

66.     As Ms. Arana still has swelling, pain, and discomfort in her left knee and leg (her knee makes a "clicking" noise when she bends it), she is unable to do anything other than limited physical activity or her left knee and leg will become very painful.

67.     Ms. Arana also has trouble sleeping at night because of the swelling, pain, and discomfort in her left knee and leg and this negatively affects her energy levels and ability to function during the daytime.

68.     Although Ms. Arana continued with her HEP after in-person physical therapy ended, she continued to have swelling, discomfort, and pain in her left knee.

69.     And as described above, there was still a very noticeable hematoma on Ms. Arana's left leg/knee that simply would not go away.

70.     Ms. Arana still attempted to be as active is she was before falling through the pool deck – especially with respect to walking her dog and doing her daily chores, errands, and other daily activities.

71.     However, Ms. Arana was limited in the distance she could walk her dog.  Ms. Arana was only able to take short walks – a few blocks or so without her left knee starting to ache and cause her pain.

72.     Unfortunately, one day in early June 2022, while Ms. Arana was out walking, her left knee just "gave out" and she fell to the ground.

73.     Ms. Arana felt a tremendous amount of pain in her left leg and in her left ankle.

74.     Ms. Arana saw Dr. Andrew Brief ("Dr. Brief") in June 2022 for her left ankle and knee.

75.     Dr. Brief examined Ms. Arana and requested imaging on the left leg which revealed a partially torn Achilles tendon.

76.     Dr. Brief advised Ms. Arana that surgery would not be required to repair the torn Achilles and that she would need to stay off her left leg to let the Achilles tear heal and the she would need to start physical therapy.

77.     Dr. Brief referred Ms. Arana to Twin Boro Physical Therapy which she started on or about August 2, 2022.

78.     While waiting for the Achilles to heal, Ms. Arana sough a second opinion as her left knee/ankle and she was examined by Dr. James Giordano ("Dr. Giordano").

79.     Ms. Arana saw Dr. Giordano at Ridgewood Orthopedic Group in Ridgewood, New Jersey.

80.     Dr. Giordano examined Ms. Arana and told her that he did not think surgery was required for the Achilles tear and that the left knee was her primary concern.

81.     Dr. Giordano recommended Ms. Arana start the physical therapy program as soon as she could with her Achilles injury.

82.     At her initial intake for physical therapy, Ms. Arana was evaluated by Brian Fallon, PT, who noted that Ms. Arana had "significant" difficulty ascending and descending stairs; "significant" difficulty walking, standing, and with daily activities and chores.  Ms. Arana reported "significant" pain, loss of range of motion and reduced ability to bend due to the injuries in her left knee and leg.

83.     Ms. Arana reported the pain at 7/10 and localized to her left knee and ankle.

84.     A plan of care was devised for Ms. Arana's physical therapy and she started her physical therapy on or about August 2, 2022.

85.     Ms. Arana attended seventeen (17) sessions of physical therapy through November 2022.

86.     Ms. Arana was discharged from physical therapy in November 2022 and provided a HEP from Twin Boro Physical Therapy with exercises and physical therapy to do at home to help improve her left knee/leg and ankle.

87.     Ms. Arana has faithfully followed the HEP, but still has pain and discomfort in her left knee and ankle at times.

88.     Ms. Arana also has a large hematoma on her left knee – a permanent disfigurement.

89.     Ms Arana still cannot do what she used to do before she fell through the pool deck at the Property.  Ms. Arana feels pain and discomfort in her left leg when she walks any measurable distances, stands for an extended period of time, or sits for too long and she has trouble sleeping through the night as her left leg will start hurting – she feels the effects of her injured left knee/leg every day.

90.     A regulation promulgated under Mass. Gen. Laws ch. 93A, 940 Code Mass. Regs. 3.17, states:

> It shall be an unfair or deceptive act or practice for an owner to: (a) Rent a dwelling unit which, at the inception of the tenancy 1. contains a condition which amounts to a violation of law which may endanger or materially impair the health, safety, or well-being of the occupant; or 2. is unfit for human habitation;… [or] (c) Fail to disclose to a prospective tenant the existence of any condition amounting to a violation of law within the dwelling unit of which the owner had knowledge or upon reasonable inspection could have acquired such knowledge at the commencement of the tenancy; [or] (d) Represent to a prospective tenant that a dwelling unit meets all requirements of law when, in fact, it contains violations of law; [or] (e) Fail within a reasonable time after receipt of notice form the tenant to make repairs in accordance with a pre-existing representation made to the tenant; [or] (f) Fail to provide services and/or supplies after the making of any representation or agreement, that such services would be provided during the term or any portion of the term of the tenancy agreement;… [or] (i) Fail to comply with the State Sanitary Code

or any other law applicable to the conditions of a dwelling unit within a reasonable time after notice of a violation of such code or law from the tenant or agency[.]

940 C.M.R. 3.17.

91.    Moreover, 940 Code Mass. Regs. 3.17(3)(b)(1-2) states, in pertinent part:

It shall be an unfair or deceptive practice for an owner to enter into a written rental agreement which fails to state fully and conspicuously, in simple and readily understandable language: 1. The names, address, and telephone numbers of the owner, and any other person who is responsible for the care, maintenance and repair of the property; [and] 2.  The name, address, and telephone number of the person authorized to receive notices of violations of law and to accept service of process on behalf of the owner[.]

940 C.M.R. 3.17(3)(b)(1-2).

92.    Moreover, Massachusetts's Supreme Judicial Court ("SJC") has held that, "every landlord that rents residential property warrants to its tenants that the premises will be delivered and maintained in a habitable condition."  *Simon v. Solomon*, 385 Mass. 91, 96 (1982) (citing *Boston Hous. Auth. v. Hemingway*, 363 Mass. 184 (1973)).

93.    In *Solomon*, the SJC continued, "at a minimum, this warranty imposes on the landlord a duty to keep the dwelling in conformity with the State Sanitary Code."  *Id.* (citing *Hemingway*, 363 Mass. at 200 n.16); *Crowell v. McCaffrey*, 377 Mass. 443, 451 (1979); *see also Hemingway*, 363 Mass. at 215-219 (Quirico, J., concurring in part and dissenting in part); *Jablonski v. Clemons*, 60 Mass. App. Ct. 473, 475 (2004) ("[i]mplied in every residential lease is a warranty that the leased premises is fit for human occupation and will remain so for the duration of the tenancy (i.e., there are no latent or patent defects in the facilities vital to the use of the premises.").

94.    "The implied warranty applies to significant defects in the property itself." *McAlister v. Boston Hous. Auth.*, 429 Mass. 300, 305 (1999).  Further, "a landlord that fails to

maintain a habitable dwelling for its tenant is liable for resulting personal injuries, at least when the landlord has failed to exercise reasonable care in maintenance." *Simon*, 385 Mass. at 96 (citing *Crowell*, 377 Mass. at 450-451).

95.     And under 105 Code Mass. Regs. 410.500, "[e]very *owner* shall maintain the foundation, floors, walls, doors, windows, ceilings, roof, staircases, *porches*, chimneys, and *other structural elements* of his dwelling… in good repair and *in every way fit for the use intended* (emphasis added)."  105 C.M.R. 410.500.

96.     The SJC has also held that "[a] duty exists under c. 93A to disclose material facts known to a party at the time of a transaction."  *Underwood v. Risman*, 414 Mass. 96, 100 (1993). (citing *Nei v. Burley*, 388 Mass. 307, 316-317 (1983); *Sheehy v. Lipton Indus.*, 24 Mass. App. Ct. 188, 195 (1987); *Lawton v. Dracousis*, 14 Mass. App. Ct. 164, 170 (1982)).

97.     Accordingly, Ms. Arana alleges that the Moltas engaged in the following unfair and deceptive acts, omissions, or practices in violation of Mass. Gen. Laws ch. 93A:

- Failing to maintain the pool deck and/or pool deck boards in a structurally sound and safe condition and fit for their intended purpose when the Moltas were told by the pool repairman, in advance of renting the Property to the Ibachs, that the pool deck and/or pool deck boards were rotten and needed to be repaired and/or replaced;

- Failing to maintain the pool deck and/or pool deck boards in a structurally sound and safe condition and fit for their intended purpose when reasonable inspection would have detected the rotten pool deck and/or rotten pool deck boards were *not* in a structurally sound condition and were indeed *unsafe* and *unfit* for their intended purpose;

- Listing the Property for rent to the public when the pool deck and/or pool deck boards were rotten and were *not* in a structurally sound and safe condition and were unfit for their intended purpose;

- Renting the Property to the Ibachs when the pool deck and/or pool deck boards were rotten and were *not* in a structurally sound and safe condition and were not fit for their intended purpose;

- Failing to fix and/or replace/repair the rotten pool deck and/or pool deck boards that were *not* in a structurally sound and safe condition and were not fit for their intended purpose within a reasonable time period *after* the Moltas were provided actual notice via text message by Mrs. Ibach on June 5, 2020, that one of the pool deck boards had cracked after she walked across the pool deck;

- Breaching the warranty of habitability incorporated into every rental lease in the Commonwealth by renting the Property to the Ibachs when the pool deck and/or pool deck boards were rotten, were *not* in a structurally sound and safe condition, and were *not* fit for their intended purpose, rendering the Property, and, in particular, the pool deck, unsafe and unfit for human habitation;

- Failing to disclose the material fact that the Property's pool deck was in an unsafe and dangerous condition prior to renting the Property to the Ibach family and Ms. Arana;

- Engaging in false advertising by listing the Property on WNAV's website with pictures of the pool and the pool deck without disclosing the dangerous

condition of the pool deck and/or falsely advertising that the pool and pool deck were fit for its intended purpose;

- Breaching the common law implied warranty of habitability with respect to the Property the Moltas rented to the Ibachs and Ms. Arana; and

- Possibly violating: (i) 780 Code Mass. Regs. § 114.1 (2017), The Massachusetts State Building Code; (ii) 105 Code Mass. Regs. 410, The Massachusetts State Sanitary Code Chapter II: Minimum Standards of Fitness for Human Habitation;[1] and (iii) the Federal Trade Commission Act.

98.    Ms. Arana suffered personal injuries that were directly and proximately caused by your violations of Mass. Gen. Law ch. 93A as stated above.

## FIRST CAUSE OF ACTION
### Negligence
### (Ms. Arana against the Moltas)

99.    Ms. Arana incorporates by reference each and every preceding paragraph as if fully restated herein.

100.    As the owners and landlords of the Property who listed and marketed for rent and ultimately rented the Property to the Ibachs and Ms. Arana, the Moltas owed Ms. Arana a duty to maintain the Property in a reasonably safe condition.

101.    The Moltas repeatedly breached this duty they owed to the Ibach family and Ms. Arana in the following ways:

---

[1] *See* 105 CM.R. 410.500 ("Every *owner* shall maintain the foundation, floors, walls, doors, windows, ceilings, roof, staircases, *porches*, chimneys and *other structural elements* of his dwelling… in good repair and in every way fit for the use intended (emphasis added).").

- The Moltas failed to maintain the pool deck and pool deck boards in a reasonably safe condition when the listed and marketed and ultimately rented the Property to the Ibachs and Ms. Arana;

- The Moltas failed to disclose to the Ibachs and Ms. Arana that the pool deck was in an unreasonably dangerous condition and not fit for its intended purposed, when they rented the Property to the Ibach family and Ms. Arana; and

- The Moltas failed to fix, repair and/or maintain the pool deck and the pool deck boards in a reasonably safe condition despite have actual knowledge of the unreasonably dangerous and unsafe condition of the pool deck and pool boards – as "Scott" had informed Mr. Molta of the rotten pool deck boards well before the Ibachs and Ms. Arana rented the Property from Defendants.

102.    Nonetheless, despite having actual knowledge of the rotten pool deck boards after the Ibachs and Ms. Arana rented the Property from the Moltas, the Moltas failed to fix, repair and/or maintain the pool deck and the pool deck boards in a reasonably safe condition despite have actual knowledge of the unreasonably dangerous and unsafe condition of the pool deck and pool boards – as Mrs. Ibach texted Mr. Molta concerning a pool deck board that had cracked when she walked on it.

103.    Despite having actual knowledge that a pool deck board had cracked during the first week or so the Ibachs were renting the Property from the Moltas, the Moltas waited six (6) days to repair the rotten pool deck boards – an unreasonable amount of time considering the Ibachs and Ms. Arana were still renting the Property from them.

104.    The Moltas' breach of the duties they owed Ms. Arana were also a direct and proximate cause of the personal injuries Ms. Arana suffered when she fell through the rotten pool deck boards at the Property.

105.    The Moltas' breach of the duties they owed Ms. Arana were also a direct and proximate cause of the personal injuries Ms. Arana suffered when she fell and tore her Achilles tendon in her left ankle after her left leg and knee had been weakened due to the injuries Ms. Arana suffered when she fell through the rotten pool deck boards at the Property.

106.    The Moltas' breach of the duties they owed Ms. Arana were also a direct and proximate cause of the permanent disfigurement caused by the left hematoma that still remains in her left knee/leg area after Ms. Arana suffered the personal injuries she sustained when she fell through the rotten pool deck boards at the Property.

107.    The Moltas' negligence was also the direct and proximate cause of Ms. Arana's loss of enjoyment of life as Ms. Arana can no longer do many of the things she enjoyed doing before she was injured falling through the rotten pool deck boards at the Property.  To wit, she can no longer take long walks for fear her left knee or ankle might "give out."  She also experiences pain and discomfort in her left leg constantly and has trouble standing, sitting, walking and even sleeping because of the pain and discomfort in her left leg.

108.    Ms. Arana has also suffered emotional distress as a result of the injuries to and permanent disfigurement of her left leg.  She is embarrassed to wear shorts or a skirt because the hematoma in her left leg is still readily visible – even if she wears pants.

109.    It was foreseeable that Ms. Arana would suffer all of these injuries by falling through rotten pool deck boards if the pool deck was not kept in a reasonable safe condition.

**SECOND CAUSE OF ACTION**
**Violation of M.G.L. ch. 93A**
**(Ms. Arana against the Moltas)**

110.     Ms. Arana incorporates by reference each and every preceding paragraph as if

fully restated herein.

111.     The Moltas are record owners of the Property.

112.     The Moltas are persons engaged in trade or commerce within the Commonwealth

at all times relevant to this action as they owned and rented the Property to the general public

through WNAV's website, including renting the Property to the Ibachs and Ms. Arana.

113.     The regulations promulgated under Mass. Gen. Laws ch. 93A, 940 Code Mass.

Regs. 3.17, (which are applicable here) state:

> It shall be an unfair or deceptive act or practice for an owner to: (a)
> Rent a dwelling unit which, at the inception of the tenancy 1.
> contains a condition which amounts to a violation of law which
> may endanger or materially impair the health, safety, or well-being
> of the occupant; or 2. is unfit for human habitation;… [or] (c) Fail
> to disclose to a prospective tenant the existence of any condition
> amounting to a violation of law within the dwelling unit of which
> the owner had knowledge or upon reasonable inspection could
> have acquired such knowledge at the commencement of the
> tenancy; [or] (d) Represent to a prospective tenant that a dwelling
> unit meets all requirements of law when, in fact, it contains
> violations of law; [or] (e) Fail within a reasonable time after
> receipt of notice form the tenant to make repairs in accordance
> with a pre-existing representation made to the tenant; [or] (f) Fail
> to provide services and/or supplies after the making of any
> representation or agreement, that such services would be provided
> during the term or any portion of the term of the tenancy
> agreement;… [or] (i) Fail to comply with the State Sanitary Code
> or any other law applicable to the conditions of a dwelling unit
> within a reasonable time after notice of a violation of such code or
> law from the tenant or agency[.]

940 C.M.R. 3.17.

114.     Moreover, 940 Code Mass. Regs. 3.17(3)(b)(1-2) states, in pertinent part:

> It shall be an unfair or deceptive practice for an owner to enter into a written rental agreement which fails to state fully and conspicuously, in simple and readily understandable language: 1. The names, address, and telephone numbers of the owner, and any other person who is responsible for the care, maintenance and repair of the property; [and] 2.  The name, address, and telephone number of the person authorized to receive notices of violations of law and to accept service of process on behalf of the owner[.]

940 C.M.R. 3.17(3)(b)(1-2).

115.      Moreover, the SJC has held that, "every landlord that rents residential property warrants to its tenants that the premises will be delivered and maintained in a habitable condition."  *Simon v. Solomon*, 385 Mass. 91, 96 (1982) (citing *Boston Hous. Auth. v. Hemingway*, 363 Mass. 184 (1973)).

116.      In *Solomon*, the SJC continued, "at a minimum, this warranty imposes on the landlord a duty to keep the dwelling in conformity with the State Sanitary Code."  *Id.* (citing *Hemingway*, 363 Mass. at 200 n.16); *Crowell v. McCaffrey*, 377 Mass. 443, 451 (1979); *see also Hemingway*, 363 Mass. at 215-219 (Quirico, J., concurring in part and dissenting in part); *Jablonski v. Clemons*, 60 Mass. App. Ct. 473, 475 (2004) ("[i]mplied in every residential lease is a warranty that the leased premises is fit for human occupation and will remain so for the duration of the tenancy (i.e., there are no latent or patent defects in the facilities vital to the use of the premises.").

117.      "The implied warranty applies to significant defects in the property itself."  *McAlister v. Boston Hous. Auth.*, 429 Mass. 300, 305 (1999).  Further, "a landlord that fails to maintain a habitable dwelling for its tenant is liable for resulting personal injuries, at least when the landlord has failed to exercise reasonable care in maintenance."  *Simon*, 385 Mass. at 96 (citing *Crowell*, 377 Mass. at 450-451).

118.    And under 105 Code Mass. Regs. 410.500, "[e]very *owner* shall maintain the foundation, floors, walls, doors, windows, ceilings, roof, staircases, *porches*, chimneys, and *other structural elements* of his dwelling… in good repair and *in every way fit for the use intended* (emphasis added)."  105 C.M.R. 410.500.

119.    The SJC has also held that "[a] duty exists under c. 93A to disclose material facts known to a party at the time of a transaction."  *Underwood v. Risman*, 414 Mass. 96, 100 (1993). (citing *Nei v. Burley*, 388 Mass. 307, 316-317 (1983); *Sheehy v. Lipton Indus.*, 24 Mass. App. Ct. 188, 195 (1987); *Lawton v. Dracousis*, 14 Mass. App. Ct. 164, 170 (1982)).

120.    Accordingly, Ms. Arana alleges that the Moltas engaged in the following unfair and deceptive acts, omissions, or practices in violation of Mass. Gen. Laws ch. 93A:

- Failing to maintain the pool deck and/or pool deck boards in a structurally sound and safe condition and fit for their intended purpose when the Moltas were told by the pool repairman, in advance of renting the Property to the Ibachs, that the pool deck and/or pool deck boards were rotten and needed to be repaired and/or replaced;

- Failing to maintain the pool deck and/or pool deck boards in a structurally sound and safe condition and fit for their intended purpose when reasonable inspection would have detected the rotten pool deck and/or rotten pool deck boards were *not* in a structurally sound condition and were indeed *unsafe* and *unfit* for their intended purpose;

- Listing the Property for rent to the public when the pool deck and/or pool deck boards were rotten and were *not* in a structurally sound and safe condition and were unfit for their intended purpose;

- Renting the Property to the Ibachs when the pool deck and/or pool deck boards were rotten and were *not* in a structurally sound and safe condition and were not fit for their intended purpose;

- Failing to fix and/or replace/repair the rotten pool deck and/or pool deck boards that were *not* in a structurally sound and safe condition and were not fit for their intended purpose within a reasonable time period *after* the Moltas were provided actual notice via text message by Mrs. Ibach on June 5, 2020, that one of the pool deck boards had cracked after she walked across the pool deck;

- Breaching the warranty of habitability incorporated into every rental lease in the Commonwealth by renting the Property to the Ibachs when the pool deck and/or pool deck boards were rotten, were *not* in a structurally sound and safe condition, and were *not* fit for their intended purpose, rendering the Property and, in particular, the pool deck, unsafe and unfit for human habitation;

- Failing to disclose the material fact that the Property's pool deck was in an unsafe and dangerous condition prior to renting the Property to the Ibach family and Ms. Arana;

- Engaging in false advertising by listing the Property on WNAV's website with pictures of the pool and the pool deck without disclosing the dangerous condition of the pool deck and/or falsely advertising that the pool and pool deck were fit for its intended purpose;

- Breaching the common law implied warranty of habitability with respect to the Property the Moltas rented to the Ibachs and Ms. Arana; and

- Possibly violating: (i) 780 Code Mass. Regs. § 114.1 (2017), The Massachusetts State Building Code; (ii) 105 Code Mass. Regs. 410, The Massachusetts State Sanitary Code Chapter II: Minimum Standards of Fitness for Human Habitation;[2] and (iii) the Federal Trade Commission Act.

121.    The Moltas' violations of Mass. Gen. Laws ch. 93A were done willfully and knowingly.

122.    Ms. Arana presented the Moltas with a Mass. Gen. Laws ch. 93A demand letter on February 17, 2022.

123.    Ms. Arana suffered personal injuries, emotional distress and pecuniary losses that were directly and proximately caused by the Moltas' violations of Mass. Gen. Law ch. 93A as stated above.

124.    The Moltas' violations of Mass. Gen Laws ch. 93A were also the direct and proximate cause of Ms. Arana's loss of enjoyment of life as Ms. Arana can no longer do many of the things she enjoyed doing before she was injured falling through the rotten pool deck boards at the Property.  To wit, she can no longer take long walks for fear her left knee or ankle might "give out."  She also experiences pain and discomfort in her left leg constantly and has trouble standing, sitting, walking and even sleeping because of the pain and discomfort in her left leg.

125.    Ms. Arana has also suffered emotional distress as a result of the injuries to and permanent disfigurement of her left leg.  She is embarrassed to wear shorts or a skirt because the hematoma in her left leg is still readily visible – even if she wears pants.

126.    Ms. Arana seeks all damages available for the Moltas' violations of Mass. Gen. Laws. ch. 93A.

---

[2] *See* 105 CM.R. 410.500, *supra*.

## THIRD CAUSE OF ACTION
### Negligence
### (Ms. Arana against WNAV)

127.    Ms. Arana incorporates by reference each and every preceding paragraph as if fully restated herein.

128.    WNAV owed a duty to Ms. Arana to use reasonable care in marketing and listing the Property in advertising the Property for rent to WNAV's website.

129.    By marketing, listing, and renting the Property on its website WNAV made representations that the Property was safe for use by the public and Ms. Arana and her family.

130.    WNAV owed a duty to Ms. Arana to ensure the Property was maintained and in a reasonably safe condition when it marketed, listed and/or rented and/or facilitated the rental of the Property to Ms. Arana and her family.

131.    WNAV breached the duties it owed Ms. Arana when it failed to ensure the Property was in a reasonably safe condition before it marketed, listed, rented, and/or facilitated the rental of the Property to Ms. Arana and her family.

132.    WNAV knew or should have known that the Property was not in a reasonably safe condition when it marketed, listed, rented, and/or facilitated the rental of the Property to Ms. Arana and her family.

133.    WNAV knew or should have known that the pool deck was not in a reasonably safe condition when it marketed, listed, rented, and/or facilitated the rental of the Property to Ms. Arana and her family.

134.    WNAV's breach of the duties it owed Ms. Arana were also a direct and proximate cause of the personal injuries Ms. Arana suffered when she fell through the rotten pool deck boards at the Property.

135.    WNAV's breach of the duties it owed Ms. Arana were also a direct and proximate cause of the personal injuries Ms. Arana suffered when she fell and tore her Achilles tendon in her left ankle after her left leg and knee had been weakened due to the injuries Ms. Arana suffered when she fell through the rotten pool deck boards at the Property.

136.    WNAV's breach of the duties it owed Ms. Arana were also a direct and proximate cause of the permanent disfigurement caused by the left hematoma that still remains in her left knee/leg area after Ms. Arana suffered the personal injuries she sustained when she fell through the rotten pool deck boards at the Property.

137.    WNAV's negligence was also the direct and proximate cause of Ms. Arana's loss of enjoyment of life as Ms. Arana can no longer do many of the things she enjoyed doing before she was injured falling through the rotten pool deck boards at the Property.  To wit, she can no longer take long walks for fear her left knee or ankle might "give out."  She also experiences pain and discomfort in her left leg constantly and has trouble standing, sitting, walking and even sleeping because of the pain and discomfort in her left leg.

138.    Ms. Arana has also suffered emotional distress as a result of the injuries to and permanent disfigurement of her left leg.  She is embarrassed to wear shorts or a skirt because the hematoma in her left leg is still readily visible – even if she wears pants.

139.    It was foreseeable that Ms. Arana would suffer all of these injuries by falling through rotten pool deck boards if the pool deck was not kept in a reasonable safe condition.

## JURY DEMAND

140.    Ms. Arana requests a trial by jury with respect to all claims.

## DAMAGES & PRAYERS FOR RELIEF

141.    Ms. Arana prays for the following relief as against Defendants:

a.  All damages allowed against Defendants for their negligence in causing Ms. Arana's personal injuries, permanent disfigurement, pain and suffering, loss of enjoyment of life, emotional distress, pecuniary damages lost wages, medical bills, co-pays and all other consequential damages that were directly and proximately caused by Defendants' negligence;

b.  All damages allowed pursuant to Mass. Gen. L. ch. 93A, including treble damages, costs and attorneys' fees;

c.  Pre-judgment interest;

d.  Post-judgment interest; and

e.  All other relief to this Honorable Court deems just and reasonable.

Respectfully submitted,

Plaintiff,

ISABEL ARANA,

By her attorneys,

Edward C. Cumbo (BBO No. 661284)
 *e.cumbo@rc-llp.com*
Robert Richardson (BBO No. 676947)
 *r.richardson@rc-llp.com*
RICHARDSON & CUMBO, LLP
101 Federal Street, Suite 1900
Boston, MA 02110
Tel: (617)217-2779

DATED:      May 19, 2023